THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN CRUZ *et al.*, Defendants-Appellants.

First District (5th Division) Nos. 82—2249, 82—2277, 82—2359 cons.

Opinion filed December 7, 1984.

John T. Theis, of Chicago, for appellant Juan Cruz.

William A. Swano, of Chicago (Kathleen M. Pantle, of counsel), for appellant Darit Lindgren.

Timothy P. O'Neill, of Oak Park, for appellant Patrick Staerzl.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Thomas D. Bilyk, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendants Juan Cruz, Darit Lindgren and Patrick Staerzl were convicted of manufacturing a controlled substance and possession with intent to deliver a controlled substance (Ill. Rev. Stat. 1979, ch. 56½, pars. 1401 and 1206(e)(1)), and each was sentenced to 30 days in jail and 30 months' probation. The trial court acquitted a fourth defendant who was tried with defendants herein. Defendants maintain that the State failed to prove their guilt beyond a reasonable doubt; Staerzl and Lindgren also claim that the convictions violate the one-act one-crime principle. Because the appeal attacks the sufficiency of the evidence, we set out the facts at length.

As an overview, the bulk of trial testimony consisted of observations of one or more of the defendants on nine different days by five agents of the Drug Enforcement Administration (DEA). The surveillance, which we summarize chronologically rather than by agent, culminated in the execution of a search warrant at 1314 West Grand Avenue, Chicago, on January 23, 1981. Based on his participation in the search and analysis of items seized, a DEA chemist testified concerning the production, composition and quantity of various substances found there. In addition, the parties stipulated to a number of incidental facts.

On November 17, 1980, an agent went to the Wilkins-Anderson Company, where he wiped three beakers free from fingerprints, replaced them in a box and noted the design on the box. He set up surveillance outside; at 11:30 a.m., the agent saw Lindgren carry a similar box from Wilkins-Anderson and place it in the rear seat of a tan Cadillac. The agent followed Lindgren to the corner of Grand and Elizabeth, where Lindgren removed the box from the rear seat and carried it into a building on the northwest corner. The building, located at 1314 West Grand Avenue, appeared to be a garage, with

large overhead doors on both Grand and Elizabeth, and a sign which read "Grand Auto Body." The body shop abutted a residential building to the north at 510 Elizabeth.

The agent also observed Staerzl and Cruz that day. Staerzl made several trips between the body shop and a hotdog stand located directly across Elizabeth at 1248 West Grand, on the northeast corner of the intersection. The agent stated that Staerzl spent most of his time behind the counter of the hotdog stand, and appeared to be running it. Staerzl let himself into the body shop with a key, stayed an average of 10-15 minutes, and on one trip carried a white plastic pail from the hotdog stand to the body shop. The agent saw Cruz standing inside the body shop near the overhead door on Elizabeth Street when that door, apparently operated from inside, opened to admit a red Ford Bronco.

On January 12, 1981, an agent observed Lindgren as he pulled up to the body shop in a red Chevy pickup truck. Lindgren stopped briefly at the hotdog stand, then went into the body shop. Later Staerzl and Cruz arrived in a yellow Mercedes Benz, stopped briefly at the hotdog stand, then went into the residential building at 510 Elizabeth. Staerzl and Cruz left in the Mercedes; Lindgren was not seen again that day.

The next day, January 13, an agent saw Staerzl walk from 510 Elizabeth to the hotdog stand, then drive to the Injecto Molding Company. The agent noticed that Staerzl carried a bag when he left Injecto at 4:30 p.m. The agent did not follow Staerzl, but he observed the same car parked at the body shop immediately upon his return. At about 5:15 p.m., Staerzl left the hotdog stand and went to the body shop for about 20 minutes.

On January 14, Staerzl was seen making several trips between 3 and 5 p.m., stopping for 15 to 20 minutes at the hotdog stand, the body shop, and 510 Elizabeth. At about 5 p.m., Lindgren joined Staerzl in the body shop, where they both stayed until about 6:30 p.m., except that Lindgren went to 510 Elizabeth for a few moments during that period. Lindgren left at about 6:30 p.m., and Staerzl at about 7:15 p.m.

On January 16, an agent drove slowly down Elizabeth Street, past the body shop's open overhead door, and observed two hooded benches, glassware and apparatus. Lindgren was standing in the doorway. The agent saw Lindgren leave at 4, then saw Staerzl walk from the hotdog stand to the body shop at 4:20 p.m. Approximately 15 minutes later, the agent saw Lindgren and Staerzl exit the body shop, but the agent stated that he had not seen Lindgren return there after his 4

p.m. departure.

On January 19, an agent followed Lindgren to the Wilkins-Anderson Company. Lindgren went inside through the front door and emerged with a piece of paper, then went to the loading dock, where he picked up several boxes and placed them in his car. Another agent followed Lindgren back to the body shop. After he took the boxes into the body shop, Lindgren went to the hotdog stand and spoke with Staerzl. The two left the hotdog stand and conversed outside for several minutes. Lindgren then returned to the body shop, and Staerzl returned to the hotdog stand. Later, an agent followed Lindgren to 2930 North Sheridan Road.

On January 20, the Mercedes and Cadillac were parked at the hotdog stand when surveillance began at 10 a.m. Staerzl was seen just before noon, and Lindgren was seen at about 1 p.m. At 3:30 p.m., Cruz and Lindgren left the body shop and drove from the vicinity in a yellow Datsun 240Z. A few minutes later, Staerzl emerged from the body shop, stopped briefly at the hotdog stand, and drove off in the Mercedes. At approximately 4 p.m., the Mercedes, then the Datsun, returned; Cruz, Lindgren and Staerzl conversed in the parking lot for several minutes. After the three spent a few more minutes in the hotdog stand, Cruz and Lindgren went to the body shop. Lindgren left the area from 5 to 5:40 p.m. Sometime around 5:30 p.m., Staerzl stopped briefly at the body shop, then went to Cavello's Lounge nearby.

At 6:30 that evening, an agent walked past the body shop. He noticed that the lights were on, heard a fan operating at the rear of the building, and smelled a chemical odor. The agent then followed Cruz from the body shop to the hotdog stand and smelled a similar chemical odor when he stood near Cruz. Cruz and Lindgren left the area at 8:15 p.m. The agent walked past the building again, noticed that the lights were off and heard no sound from the fan.

On January 22, the lights and fan were on until Cruz and Lindgren left at 9 p.m.

On January 23, an agent observed Cruz as he parked the red Chevy pickup truck at the Curtis-Mattheson Scientific Company. Cruz went inside and came out with an employee pushing a cart laden with five metal cans. After loading the cans into the truck, Cruz drove away. The agent attempted to follow, but lost the truck; he next saw it at the body shop.

Meanwhile, other agents maintained surveillance in the vicinity of the body shop. Cruz pulled up to the building, then walked around the corner and out of view. Moments later, he came into view as the over-

head door opened. When Cruz returned to the driver's seat, the agents, with the help of the Chicago police, converged on the body shop and executed a search warrant.

Agents found two 10-foot workbenches with ventilation hoods mounted overhead; the hoods were connected, in turn, to a large ceiling fan. The agents recovered chemical glassware, vacuum pumps, infrared lamps, chemistry books, receipts for equipment and chemicals, and a laboratory notebook. In addition, a wide variety of substances was seized, including hundreds of pounds of powdered material, 55-gallon drums labeled as chemicals, bottled liquids, and beakers of refrigerated substances. The agent who had driven past the open overhead door one week earlier and observed the equipment inside at that time stated that he saw some of the same equipment during the search. The agent who had walked past the "body shop" three days before the search testified that the inside of the building had the same chemical odor as he had smelled outside.

Agents also discovered a large hole in the north wall of the 1314 Grand building which opened through a south wall into the 510 Elizabeth address and provided mutual access to the premises. Agents searched the 510 Elizabeth address, but the fruit of this search was suppressed as to Staerzl. A search of the premises at 2930 North Sheridan was also invalidated, and the evidence suppressed as to Lindgren. No issue is raised concerning the suppression of this evidence.

DEA chemist Dr. Sanford Angelos was stipulated to be an expert in his field, and testified that he was familiar with the processes for synthesizing methaqualone, and he had seen clandestine laboratories for the production of methaqualone. Based on his observations during the search of 1314 West Grand Avenue on January 23, 1981, Dr. Angelos opined that the laboratory was sufficient to produce methaqualone. Angelos' chemical analysis revealed that substances seized there contained between 700 and 1000 grams of methaqualone. He also examined the laboratory notebook, and determined that the substance seized, methaqualone, as well as some apparent constituent elements, was the result of processes detailed in the notebook. Dr. Angelos estimated that the other "batches" described in the notebook produced an average of 800 grams of methaqualone each, for a total of six or seven kilograms. He also estimated that the raw materials on hand were sufficient to produce 220 kilos of methaqualone. At 300 milligrams per pill, he concluded that in excess of three million pills had been or could be made.

The parties stipulated that Staerzl paid the electric and gas bills

for 1314 West Grand, and that the tax bill was sent to Staerzl's mother-in-law. Staerzl owned the business license for the hotdog stand, which shared a telephone line with the body shop. Fingerprints lifted from one of the ventilation hoods matched Staerzl's left index, middle and ring fingers. The parties also stipulated that the handwriting in the laboratory notebook was Lindgren's, and that his signature appeared on certain receipts. Although vehicle registrations and receipts were admitted into evidence, the contents of the documents do not appear in the record. Surveillance photographs and a videotape of the search were also introduced into evidence.

The trial court found these defendants guilty, and sentenced each to 30 months' probation, the first 30 days of which were to be served in the county jail. Defendants filed timely notices of appeal.

OPINION

Each defendant maintains that, as to him, the State produced insufficient evidence of manufacture, possession and intent to distribute. With respect to manufacture, Cruz argues that the evidence showed only his presence and failed to show any act resulting in the manufacture of a controlled substance. Lindgren argues that the evidence revealed only that he picked up boxes of equipment, wrote in a notebook, and associated with the other defendants, all legal activities which could give rise to no more than a suspicion of involvement in manufacture. Staerzl argues that no evidence was introduced of any act by him resulting in the manufacture of a controlled substance.

The Controlled Substance Act prohibits the knowing manufacture of a scheduled substance such as methaqualone. (Ill. Rev. Stat. 1979, ch. 56½, pars. 1401 and 1206(e)(1).) "Manufacture" is broadly defined as:

> "the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly, by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis and includes any packaging or repacking of the substance or labeling of its container ***." (Ill. Rev. Stat. 1979, ch. 56½, par. 1102(z).)

The thrust of defendants' arguments is that the State presented no direct evidence that they did the acts proscribed.

It is not surprising that the State relied upon circumstantial rather than direct evidence. "Circumstantial evidence is the proof of certain facts and circumstances in a given case from which the [trier of fact] may infer other connected facts which usually and reasonably

follow according to the common experience of mankind." (*Devine v. Delano* (1916), 272 Ill. 166, 179-80, 111 N.E. 742.) Echoing this general proposition, our supreme court has noted with respect to possession of illicit drugs:

> "[W]here narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics. This inference is based largely upon the nature of the commodity and the manner in which its illegal traffic is conducted. *By law the use of narcotics, except for specified medicinal purposes, is rigidly condemned. Because of this illegitimate nature of narcotics, they are sold for exorbitant sums on the black market and are therefore of great value to the person possessing them. Furthermore, since their mere possession may subject such person to severe criminal consequences, the narcotics traffic is conducted with the utmost secrecy and care.* Human experience teaches that narcotics are rarely, if ever, found unaccountably in a person's living quarters." (Emphasis added.) (*People v. Nettles* (1961), 23 Ill. 2d 306, 308, 178 N.E.2d 361, *cert. denied* (1962), 369 U.S. 853, 8 L. Ed. 2d 12, 82 S. Ct. 939.)

No less than possession, the manufacture of controlled substances is an inherently surreptitious affair, and common sense must illuminate the dark. While our research has uncovered sparse authority in this jurisdiction concerning drug manufacture, none of it addressed to the sufficiency of the evidence, the settled principles for reviewing convictions based on circumstantial evidence dispose of defendants' arguments here.

 █ Proof beyond a reasonable doubt does not require the exclusion of every possible doubt, and a conviction may be sustained upon wholly circumstantial evidence, so long as the entire chain of circumstances leads to a reasonable and moral certainty that the accused committed the crime. (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801, and authority cited therein.) Here, the evidence revealed an ongoing clandestine laboratory for the production of methaqualone at 1314 West Grand Avenue. The laboratory notebook seized during the search listed chemicals and equipment which, according to expert opinion, would aid the production of methaqualone, and set out procedures which, according to chemical analysis, actually produced the methaqualone and precursor substances found at the site. If the expert's reading of the notebook was believed, as it apparently was, each of 12 batches took about two days to process.

Independently, the evidence indicated that Lindgren was at the

site during normal working hours on seven days out of nine, and while he was there the lights and fan were on and a chemical odor was detected. He was seen picking up laboratory equipment and delivering it to the site. Lindgren stipulated that the notebook was in his handwriting. From this, the trier of fact was entitled to infer that Lindgren planned to acquire equipment and chemicals for the production of methaqualone, actually did acquire them, and spent his time at 1314 West Grand producing, preparing, compounding, synthesizing or packaging the methaqualone which was seized. Taken as a whole, all the evidence leads to a reasonable and moral certainty that Lindgren manufactured a controlled substance, and we affirm his conviction.

■ Having concluded that Lindgren's conviction for manufacture was proved beyond a reasonable doubt, the convictions of Cruz and Staerzl must be sustained on a theory of accountability. A person is criminally accountable for the acts of another if "before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c).) The evidence indicated that Cruz was inside the "body shop" during normal working hours when Lindgren delivered laboratory equipment on November 17, 1980, and the trier of fact could have inferred that Cruz operated the overhead door permitting Lindgren to enter. On several different days in January of 1981, Cruz was seen at 1314 Grand during normal working hours, spending hours at a time inside the building while the lights and fan were on. He gave off an odor like the chemicals used to manufacture methaqualone, and he was seen picking up and attempting to deliver chemicals useful in the manufacture of methaqualone. From this, the trier of fact could infer that Cruz intentionally aided, abetted, agreed or attempted to aid Lindgren in the manufacture of methaqualone. All the evidence leads to a reasonable and moral certainty that Cruz was accountable for the manufacture of a controlled substance, and we affirm his conviction.

■ Similarly, the evidence shows that Staerzl delivered a plastic pail to 1314 Grand on the same day that Lindgren delivered laboratory equipment there, and that Staerzl obtained equipment from the Injecto Molding Company. Staerzl made repeated trips to the "body shop" throughout the surveillance, and spent more than two hours there on January 14, most of the time with Lindgren. Staerzl had a key to the building, furnished utilities, and left his fingerprints on a ventilation hood over a bench of laboratory equipment. He leased the 510 Elizabeth premises, which were secretly connected to 1314

Grand, and ran the hotdog stand which shared a telephone line with the laboratory. The tax bill was sent to one of his relatives. From this, the trier of fact could infer that Staerzl intentionally aided in the planning and commission of the offense of manufacture. All the evidence leads to a reasonable and moral certainty that Staerzl was accountable for the manufacture of methaqualone, and we affirm his conviction.

Next, defendants argue that the State produced insufficient evidence of possession and intent to deliver. Each maintains that the evidence failed to show such control over the premises as would permit an inference of possession. They argue further that because no evidence was introduced concerning the normal dosage of methaqualone, evidence of quantity could not give rise to an inference of intent to distribute. We believe defendant's arguments are without merit.

■■■ A conviction for possession of a controlled substance will be sustained where the State establishes that the accused knew of the presence of the substance, and that the substance was in the immediate and exclusive control of the accused. (*People v. Nettles* (1961), 23 Ill. 2d 306, 178 N.E.2d 361, *cert. denied* (1962), 369 U.S. 853, 8 L. Ed. 2d 12, 82 S. Ct. 939.) Knowledge and control are findings of fact, and such "findings will not be disturbed on review unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of guilt." (*People v. Galloway* (1963), 28 Ill. 2d 355, 358, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665; *People v. Atencia* (1983), 113 Ill. App. 3d 247, 250, 446 N.E.2d 1243, *cert. denied* (1983), 464 U.S. 917, 78 L. Ed. 2d 261, 104 S. Ct. 283.) Absent facts and circumstances which might create such a doubt, the fact that a controlled substance is found on premises under the control of the accused will, in and of itself, support a conviction for possession. *People v. Nettles* (1961), 23 Ill. 2d 306, 308-09, 178 N.E.2d 361, *cert. denied* (1962), 369 U.S. 853, 8 L. Ed. 2d 12, 82 S. Ct. 939.

■■■ In *People v. Fox* (1962), 24 Ill. 2d 581, 182 N.E.2d 692, our supreme court defined constructive possession as that which exists without personal present dominion, and approved the idea that one who no longer has physical control may retain constructive possession, provided that he or she has had physical control, has not abandoned it, and no other person has acquired possession. (24 Ill. 2d 581, 585, 182 N.E.2d 692.) The court there found persuasive the fact that defendant "had the run of the apartment, even if he did not live there." (24 Ill. 2d 581, 585, 182 N.E.2d 692.) The instant facts reveal that each of the defendants had the run of the premises in question.

Lindgren and Cruz repeatedly let themselves and one another in, used the space and utilities for hours at a time, and closed it when they left. Although technical ownership apparently belonged to one of Staerzl's relatives, Staerzl himself exercised all of the immediate possessory incidents of ownership. The record is absolutely barren of the intimation that any other person exercised such control of the premises as would create a doubt concerning the guilt of these defendants.

 ■ Similarly, the State's failure to introduce evidence of dosage was not fatal. Intent to deliver is necessarily proved by circumstantial evidence, and possession of a quantity of a controlled substance far in excess of that which could be intended for personal use will support an inference of intent to deliver. (*People v. Kline* (1976), 41 Ill. App. 3d 261, 266-67, 354 N.E.2d 46.) Expert testimony in this case revealed that at least six or seven kilograms of methaqualone had already been produced, and chemicals on hand would be sufficient to produce an additional 220 kilograms of the substance. Although our calculation at 300 milligrams per pill yields a total in excess of three-quarters of a million pills, the expert testified that three million pills could have been produced. In either case, the trier of fact could, by application of ordinary wisdom, conclude that the quantity exceeded personal need or desire, and infer that defendants intended to deliver some or all of these pills.

Finally, defendants contend that convictions for both manufacture and possession with intent to deliver violated the one-act one-crime principle. They argue that because the necessary end result of manufacture is possession of the substance, the acts are inseparable. The State argues that acts of manufacture and possession are distinct, thus multiple convictions and concurrent sentences were proper. We agree with the State.

██ In *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, the supreme court explained that an "act is an overt or outward manifestation which will support a different offense." (66 Ill. 2d 551, 566.) The court there held that a series of closely related acts could give rise to multiple offenses so long as they were not lesser included offenses, but that sentencing for such offenses should be concurrent. We believe that manufacture and possession in this case involved separate acts even though the circumstantial evidence proving those acts overlapped. Manufacture involved the purchase of chemicals and equipment and the synthesis of chemicals in order to bring methaqualone into existence. Acts of possession consisted of exercising control over the premises where the methaqualone was stored. While we acknowl-

edge that these acts may be more difficult to distinguish on some facts (see, *e.g., People v. Dunlap* (1982), 110 Ill. App. 3d 738, 442 N.E.2d 1379), we do not see that they are necessarily indistinguishable, and we affirm multiple convictions as to the acts of these defendants.

We address one last issue which we raised at oral argument. Supreme Court Rule 607 provides that the sentencing judge may order a report of proceedings upon a defendant's verified petition showing that he or she lacked financial means. (87 Ill. 2d R. 607(b).) Lindgren, in whose name this record was prepared, represented to the court through his attorney that he was indigent, and signed a verified petition stating that he lacked the means to hire an attorney or pay for the preparation of the record. However, after the public defender's office submitted a brief which Lindgren considered to be inadequate, we granted his motion to substitute attorneys. It now appears that the record was furnished at the State's expense despite the fact that all three defendants were represented by private counsel. In order to assure the integrity of our court system's provision for appeals by poor persons, we remand this cause to the circuit court to determine whether Lindgren was in fact indigent at the time he executed the verified petition, and if he was not, to determine who should bear the cost of the record.

Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request for costs in the amount of $50 against each defendant.

For the foregoing reasons, the judgments of the circuit court are affirmed in part and remanded with directions.

Affirmed in part; remanded with directions.

MEJDA, P.J., and SULLIVAN, J., concur.