

Robert H. Aronson, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Patrick J. Finley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Following a bench trial before Judge James M. Schreier on August 25, 1988, the circuit court found defendant guilty of one count of possession with intent to deliver between 10 and 15 grams of a substance containing heroin in violation of section 401(b) of the Illinois Controlled

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK GRIFFIN, Defendant-Appellant.

First District (2nd Division) No. 1—88—2836

Opinion filed February 6, 1990.

Substances Act (Act) (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(b)) and of one count of possession with intent to deliver less than 10 grams of a substance containing cocaine in violation of section 401(c) of the Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(c)). Defendant's convictions resulted in concurrent sentences of 8½ years' imprisonment on count I and seven years' imprisonment on count II.

Defendant had been previously tried without a jury on November 5-6, 1987, before Judge Ralph Reyna, who found defendant guilty of the two offenses described above. After defendant's first trial, his attorney withdrew from the case and was replaced by defendant's present counsel, who filed a motion for a new trial. Among other charges, the motion alleged that defendant had been denied effective assistance of counsel, because his former attorney "did not communicate [with defendant] or in any way prepare for trial." Judge Reyna granted the motion on January 29, 1988, and the matter was subsequently reassigned by the presiding judge to Judge Schreier.

Defendant presents two issues for our review: first, whether the evidence was sufficient to convict, and second, whether the trial judge deprived him of a fair trial by reprimanding defense counsel and asking defendant questions tending to negate his credibility. We affirm.

At the second trial, the State presented the testimony of Chicago police department officer Joseph Cannon; defendant and his mother testified for the defense. The parties stipulated that the recovered contraband tested positive for 3.36 grams of cocaine and for 14.61 grams of heroin. The court also received into evidence a certified copy of defendant's conviction for attempted murder and armed robbery.

Cannon testified that on January 15, 1987, he proceeded with a group of other officers to 204 North Central Avenue, Chicago, Illinois, to execute a warrant authorizing the search of the third-floor east apartment for cocaine and drug paraphernalia and a black male, 26 to 30 years old, 5 feet 8 inches tall, of medium complexion. After knocking at the back door of the apartment and announcing himself as a police officer, Cannon heard running footsteps inside. He then opened the door with a sledgehammer and, finding himself in the kitchen, saw defendant fleeing through the living room. According to Cannon, defendant jumped from the front balcony onto the roof over the building entrance, leaped down onto a lower balcony and ran into the first-floor apartment. At this point, Cannon ran down the back staircase and, having apprehended defendant outside the rear of the building, took him back to the third-floor apartment.

Cannon handed the search warrant to defendant, who read it and said he understood its contents. During the search of the kitchen, the

officer found, on top of the refrigerator, 37 tinfoil packets filled with brown powder and 14 white paper packets filled with white powder. He then placed defendant under arrest. After being advised of his *Miranda* rights, defendant told Cannon that he had been living in the apartment for about one week. In a search of defendant's person, Cannon's partner found no narcotics, but recovered a key which, according to Cannon's testimony, fit the front door of the apartment.

Cannon did not find a lease in the apartment or any gas or other utility bills in defendant's ᴸame. Prior to the search, however, the gas company had informed him that the gas had been shut off. While searching the living room, Cannon noticed two operating appliances: a kerosene space heater and an electric television set.

Defendant's mother, Willie Mae Williams, testified that at the time of defendant's arrest she lived about two blocks from the 204 North Central Avenue address and that after defendant's release from prison in January 1987, she made arrangements for him to live upstairs from her living quarters in return for paying the utility bills and having them put in his name. When on cross-examination Williams was shown gas and electric bills for the upstairs apartment covering various dates from January 7 to October 30, 1987, she admitted that the bills did not reflect when they were put in defendant's name and acknowledged that the electricity bill for the months of January to April 1987 was for only $58, of which $33 represented a customer service charge. Williams also testified that she worked in a factory five and sometimes six days a week and that her living quarters did not have a staircase leading to the upstairs area where defendant lived.

Defendant testified that until January 9, 1987, he had been incarcerated in a Federal correctional facility in Oxford, Wisconsin, and that between that date and the date of his arrest on January 15, 1987, he lived in the second-floor apartment above his mother's. According to defendant, he never told the police he had been living for one week in the apartment on North Central Avenue, which, he testified, in fact belonged to his friend James Boyd, whom he had known for about 12 years at the time of trial. He denied having a key to this apartment and said the front door did not have a lock.

While defendant was visiting Boyd on January 15, defendant's testimony continued, after someone outside had sounded a car horn, Boyd left the apartment, and defendant remained inside to watch a movie on Boyd's television set. During the movie, he heard a lot of noises at the back door, looked out the window and saw a uniformed police officer, leaving the apartment through the front door. Defendant entered the adjacent apartment, went downstairs and out the back door of the

building, where he became engaged in a conversation with a uniformed police officer. At this point, several plainclothes officers jumped on defendant and arrested him, took him back to Boyd's apartment, put him in a closet and questioned him. He denied leaving the apartment in the manner described by Officer Cannon.

Defendant admitted lying under oath at his first trial. He said that previously he had testified that he did jump off the third-floor balcony onto the entrance roof and then onto the balcony on the first floor. He also admitted testifying that he kept four jogging suits in the apartment. According to defendant, his former lawyer instructed him to so testify in order not to contradict the police. Defendant claimed he fled the apartment when he saw the police because he "panicked," but denied doing anything wrong or knowing that drugs were present in the apartment.

Defendant begins by contending that the State failed to prove him guilty of the two narcotics offenses beyond a reasonable doubt because it failed to show that he had any knowledge, either actual or constructive, of the presence of contraband in the apartment. Defendant relies on a number of Illinois Supreme Court decisions which hold that where the evidence pointing to the guilt of an accused is purely circumstantial, it must be strong enough to exclude every reasonable hypothesis of innocence before the trier of fact may convict. (*People v. Garrett* (1975), 62 Ill. 2d 151, 163, 339 N.E.2d 753, 759; *People v. Lewellen* (1969), 43 Ill. 2d 74, 78, 250 N.E.2d 651, 654; *People v. Ahrling* (1917), 279 Ill. 70, 80, 115 N.E. 764, 767.) It is defendant's contention that the judge was bound to acquit, because, based on the evidence, he could have found that defendant was indeed only an innocent and unsuspecting visitor at the apartment.

■■ In *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268, however, the supreme court has recently clarified the standard of proof in criminal cases by removing any obligation to exclude all reasonable hypotheses of innocence. The court explained in *Eyler* that language once used in pattern jury instructions purporting to create any such obligation merely served to obscure the firmly entrenched standard of "proof beyond a reasonable doubt." (133 Ill. 2d at 191, 549 N.E.2d at 276; see also *People v. Pintos* (1989), 133 Ill. 2d 286, 291 ("reasonable doubt test *** should be applied in reviewing the sufficiency of evidence in all criminal cases, whether the evidence is direct or circumstantial").) Therefore, the proper standard for this court to apply in order to evaluate the sufficiency of the proof on appeal is whether the evidence, when viewed in the light most favorable to the prosecution, permits a rational trier of fact to find the elements of the

crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 48-49, 538 N.E.2d 461, 472-73, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

 To prove possession of a controlled substance, the State must show that defendant knew of its presence and that the substance was in defendant's immediate and exclusive control. (*People v. Valentin* (1985), 135 Ill. App. 3d 22, 480 N.E.2d 1351.) Knowledge may be proved by evidence of defendant's acts, declarations or conduct which fairly imply that he knew of the existence of the controlled substance at the place it was found. (*People v. David* (1986), 141 Ill. App. 3d 243, 489 N.E.2d 1124.) Absent circumstances creating a reasonable doubt, the fact that drugs are found on premises under defendant's control alone will support a conviction for possession. (*People v. Cruz* (1984), 129 Ill. App. 3d 278, 472 N.E.2d 175.) Exclusive possession may be established even though possession is joint or other persons have access to the premises. (*People v. Gant* (1986), 150 Ill. App. 3d 180, 501 N.E.2d 355, *appeal denied* (1987), 114 Ill. 2d 549, 508 N.E.2d 731, *cert. denied* (1987), 484 U.S. 843, 98 L. Ed. 2d 91, 108 S. Ct. 134.) Because knowledge and possession are questions of fact, a reviewing court will not disturb the trier's findings on those issues unless the evidence is so unbelievable, improbable or palpably contrary to the verdict that it creates a reasonable doubt as to defendant's guilt. (*People v. Valentin*, 135 Ill. App. 3d 22, 480 N.E.2d 1351.) Finally, a reviewing court will not disturb the fact finder's resolution of conflicting evidence unless it is clearly erroneous. *People v. DeMorrow* (1974), 59 Ill. 2d 352, 320 N.E.2d 1.

 A number of facts in the present case permit the inference that the North Central Avenue apartment was in defendant's control: According to Officer Cannon, defendant, after being advised of his *Miranda* rights, told him that he had been living in the apartment for one week; Cannon also testified that his partner found a key on defendant's person that fit the lock on the front door;[1] during cross-examination, defendant admitted testifying in his first trial that he kept four running suits in the apartment; and finally, defendant does

---

[1]Despite defendant's efforts both in this court and the trial court to argue that the State should have entered the key into evidence, defendant has provided no cases mandating such production. In fact, the law clearly holds that absent proof of intentional destruction, the existence of a tangible object may be proved even by circumstantial evidence. (*People v. Lopez* (1982), 107 Ill. App. 3d 792, 796, 438 N.E.2d 504, 507 (proof of illegal substance in narcotics prosecution).) Here, we have not only the benefit of Officer Cannon's direct testimony about the key, but it is also notable that defendant failed to object to it at trial.

not contest that he was the only person in the apartment at the time of the raid. Although defendant testified at the second trial that the actual tenant of the apartment was his longtime friend James Boyd, the defense did not produce anyone named Boyd as a witness or furnish any other information about him. In considering Boyd's absence, we draw attention to *People v. Adams* (1985), 109 Ill. 2d 102, 120-21, 485 N.E.2d 339, 345, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476, in which the supreme court permitted a negative inference from the accused's failure to call a nonalibi witness who could shed light on a material issue and who was presumably within the accused's control.

■ Together with all other evidence tending to prove defendant's guilt, the trier of fact may also consider evidence of defendant's flight from police. (*People v. Rossini* (1962), 25 Ill. 2d 617, 185 N.E.2d 831.) In the present case, defendant does not rebut the State's testimony that he fled the apartment when he saw the police; he merely denies having left in the spectacular manner described by Officer Cannon. Furthermore, it was the judge's prerogative as a fact finder to disbelieve defendant's proffered explanation that he panicked and fled at the sight of law enforcement officers because he had recently come home from prison.

■ In fact, defendant's credibility suffered several other critical blows at trial. First, the State introduced into evidence a certified copy of defendant's conviction for attempted murder and armed robbery. Second, the State confronted defendant with prior inconsistent statements he had made at his first trial; defendant admitted that, contrary to his latest testimony, he had previously testified that he kept four jogging suits in the apartment and that he fled the apartment by leaping off the balcony. Finally, defendant admitted lying at the first trial despite knowing that he was under oath to tell the truth. Defendant tried to explain that he lied because his former attorney instructed him not to contradict the police; however, this explanation dealt a final blow to defendant's veracity, for in his motion for a new trial after his first case he alleged that his former attorney never communicated with him in preparation for the first trial. This massive evidence of mendacity persuades us that the circuit court acted reasonably in choosing to believe Officer Cannon's version of the facts instead of defendant's. Accordingly, with reference to the element of knowledge, we find that the prosecution amply met its burden of proof beyond a reasonable doubt.

Defendant next contends that the behavior of the circuit judge at trial deprived him of a fair proceeding. First, defendant maintains in

his brief that the circuit judge "stood up and screamed at defense counsel as counsel tried to make an objection." The following colloquy during trial between Judge Schreier and defense counsel forms the basis of defendant's contention:

> "Q. [Assistant State's Attorney]: When you got back up to the apartment, your testimony is that they put you in the closet?
>
> A. [Defendant]: First they put me—we was in the dining room and they had me up against the wall, you know. They searched me, you know, they asked me—they got to ask me where some narcotics was at. I told them I don't know nothing about narcotics.
>
> Q. Sir, please answer my question.
>
> MR. ARONSON [Defense attorney]: He is. Object, your Honor.
>
> THE COURT: Keep your voice down. Sit down.
>
> MR. ARONSON: I—.
>
> THE COURT: Sit down.
>
> Q. [Assistant State's Attorney]: Please, sir—.
>
> THE COURT: Who do you think you are? Sit down.
>
> MR. ARONSON: I would like to make an objection, Judge.
>
> THE COURT: Overruled."

As the State points out, the record does not support defendant's allegation that the judge "stood up and screamed." The foregoing exchange with the court appears to be but a continuation of a similar exchange initiated by defense counsel which occurred earlier, at the very beginning of the State's cross-examination of defendant.

■ One of the inherent powers of the trial court is to preserve its own dignity by ensuring that the proceedings before it progress in a dignified and orderly fashion. (*People v. Halprin* (1983), 119 Ill. App. 3d 922, 457 N.E.2d 1010 (inherent power to initiate contempt proceedings).) In the present case, the circuit judge appears to have invoked this power to ensure the orderly cross-examination of defendant without defense counsel's unnecessary interference. The record does not indicate that he thereby exceeded traditional bounds of courtroom decorum, especially here, where the absence of a jury minimized the danger of any unfair prejudice.

Second, defendant charges that the circuit judge improperly interrupted defendant's redirect examination by asking him questions seeking to discredit the veracity of certain statements in his motion for a new trial at the end of his first case. Defendant alleges that with these inquiries the judge flew into a "rage" intending to "besmirch the character and reputation of [defendant's] present counsel," and therefore

deprived defendant of a fair trial before an impartial tribunal. Defendant's objection rests on the following portion of his redirect examination:

"Q. [Defense attorney]: And your former lawyer, how long did he meet with you to prepare for the case?

MR. CUOMO [Assistant State's Attorney]: Objection, Judge.

THE COURT: Overruled.

A. The same day of the trial.

Q. And he defended you, didn't he?

A. Yes.

Q. And after he told you what to say, you were convicted, weren't you?

MR. CUOMO: I'm going to object to this, Judge.

THE COURT: Overruled.

A. Yes.

Q. And then you got another lawyer, didn't you?

MR. CUOMO: Objection, Judge.

THE COURT: Sustained at this point, although I want to ask a question myself.

With your new lawyer, did you file a motion for a new trial saying that your previous lawyer and you did not communicate or in any way, in any way prepare for trial? Did you and your new lawyer file that motion for new trial?

A. Yes, we filed a motion.

Q. And when you said that in any way your old lawyer did not prepare for trial—.

THE COURT: Or communicate.

Q. —or communicate with you, tell Judge Schreier what you meant by that.

A. Each time I called him, you know, he would tell me, you know, to call him back, you know, and when I called him back he wasn't there.

THE COURT: What do you call, sir, your conversing with your old lawyer and going over what you should say at trial. What did you call that?

A. That was before the trial. That was a couple of minutes before we had come in here.

THE COURT: You call that communicating? Do you? Do you call that communicating?

A. That's communicating.

THE COURT: Do you call it preparing for trial albeit perjuriously preparing for trial, preparing what you're going to say.

Do you call it that?

A. (Inaudible.)"

A trial court is free to examine witnesses in its discretion, provided it does not become an advocate, abandoning its function as an impartial tribunal. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 100, 136 N.E.2d 817, 821.) *Trefonas* concerned a bench trial in which the judge extensively questioned two codefendants regarding conflicts between their signed statements and their testimony at trial. The supreme court held that, as a seeker of truth, the trial court was justified in making such inquiries. (9 Ill. 2d at 100, 136 N.E.2d at 821.) Similarly, in *People v. Sudzus* (1984), 121 Ill. App. 3d 387, 390, 459 N.E.2d 1099, 1101-02, this court found no prejudice to defendant in a bench trial where the trial judge asked him whether he had kept a record of sale for his automobile, a question relevant to the veracity of defendant's previous testimony.

We note particularly that the danger of prejudice due to judicial questioning decreases sharply in cases tried without a jury. (*United States v. Kidding* (7th Cir. 1977), 560 F.2d 1303, 1314, *cert. denied sub nom. Brown v. United States* (1977), 434 U.S. 872, 54 L. Ed. 2d 151, 98 S. Ct. 217.) The relevant inquiry in a non-jury trial is whether the tenor of the court's questioning indicates that the court has prejudged the verdict before hearing all of the evidence. (560 F.2d at 1314.) In *Kidding*, the court found that in the absence of any evidence of prejudgment by the trial court, the fact that the judge asked two defendants a total of 56 questions spanning 12 pages of transcript did not mandate reversal. 560 F.2d at 1314.

In the present case, the judge noticed a conflict between defendant's testimony on redirect examination that his former attorney told him to lie and defendant's allegation in his first motion for a new trial that the former attorney failed to communicate with him before trial. The judge then sought to elicit from defendant whether indeed there was such a conflict. Although ultimately this inquiry resulted in further impeachment, defendant's credibility had already been so seriously damaged during cross-examination that it would be unrealistic to impute prejudice to the court.

We find that the State more than adequately met its burden of proof in this case and that any alleged improprieties of the trial judge were harmless beyond a reasonable doubt. Accordingly, we affirm.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.