THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SALVADOR VALENTIN, Defendant-Appellant.

First District (5th Division)   No. 82—1608

Opinion filed July 12, 1985.

PINCHAM, J., dissenting.

Ackerman & Egan, Ltd., of Chicago (Allan A. Ackerman, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

After a jury trial, defendant Salvador Valentin was convicted of possession of a controlled substance and possession with intent to deliver a controlled substance (Ill. Rev. Stat. 1981, ch. 56½, pars. 1401, 1402 and 1204(c)(12) (heroin)), and was sentenced to 25 years' imprisonment. Defendant maintains that the trial court erred in refusing to quash his arrest and suppress evidence seized in connection therewith; that the State failed to prove his guilt beyond a reasonable doubt; that the trial court erred in rejecting jury instructions submitted by defendant; and that the prosecutor prejudiced the jury with improper argument. The following facts are pertinent to our disposition.

In his complaint for a search warrant, Detective John Corcoran

stated that he had known his informant for five months and had received correct information about narcotics from him on each of eight separate occasions. Corcoran further stated:

"On 2 October 1981 at about 10:30 Am, this individual contacted me and indicated that a person known to him as 'Julio' was selling Heroin from his residence at 1741 North Cicero. This subject stated that on this, 2 October 1981 at about 8:00 Am he went to this location at 1741 North Cicero and upon knocking on the 1st floor door, he was greeted by an individual known to him as 'Julio'. After being admitted into the 1st floor of this single family dwelling, Julio asked this subject what he was interested in. At this time, this subject stated that he wished to purchase an 'ounce' but wanted to know the exact price. The subject known as 'Julio' stated that it would cost $1600.00 At this point, my informant stated that he proceeded to give 'Julio' this amount, sixteen hundred dollars. My informant stated that Julio then indicated that he would have to put the ounce together and instructed my informant to accompany him into the basement apartment.

Upon accompanying him into the basement, the subject Julio proceeded to the kitchen of this apartment and upon reaching under the refrigerator he proceeded to remove a clear plastic bag which contained a quantity of tan powder. At this point, he proceeded to place a quantity of the tan powder from the clear plastic bag on a 'gram scale' and upon checking the weight placed this substance into another plastic bag. At this point, my informant stated that the weight was about 10 grams. Julio stated that he was going to have to keep the rest here for someone else, but that he had more upstairs and wanted my informant to accompany him back upstairs to get the rest of the 'Stuff'. It should be noted that upon asking my informant what the conversation was about he explained that the subject Julio kept some of the substance downstairs and then took him back upstairs for the rest.

At this point, my informant stated that he wanted to know if the substance he was purchasing was any good and Julio replied 'of course' and then proceeded to remove a small portion of the tan powder from the original plastic bag and gave it to my informant to 'sample'. My informant stated that he then placed this small portion into his nostrils and inhaled same. After a few minutes, he stated that he received the same effect that he has in the past when he has used Heroin. My informant

indicated that he has been utilizing Heroin for the past ten (10) years and that this substance which he inhaled was in fact Heroin. After inhaling this substance, my informant stated that Julio took the original plastic bag which still contained a quantity of tan powder, which the informant stated was Heroin, back under refrigerator. At this point, Julio took my informant and the gram scale and bag back upstairs to the first floor where he proceeded into the kitchen. He then instructed my informant to wait a few minutes, while he proceeded into another portion of the house. Upon returning he was carrying another clear plastic bag which also contained a quantity of tan powder. At this point, Julio stated 'to show my good faith, try some of this' and upon reaching into this clear plastic bag, he proceeded to remove a small portion and gave it to my informant. My informant stated that he then inhaled this tan powder and he again received the same effect that he has in the past when he has used Heroin. The subject Julio then removed some of the contents of this plastic bag and placed this on the gram scale and my informant stated that the scale read 15 grams. Julio then placed this tan powder into the plastic bag which he had taken from the basement containing the 10 grams of Heroin. Julio then shook the contents up and said that my informant could step on it twice. At this point, Julio took the plastic bag which he had obtained from the 1st floor and placed it back in another portion of the house. He then told my informant to return if he needed any more 'stuff' and if he purchased larger amounts he would give him a better price. At this point, my informant left this residence. My informant stated that when he left this location the subject Julio was in possession of at least two clear plastic bags which contain Heroin.

Based on the facts as presented, it is respectfully requested that a Search warrant be issued."

At 4:15 p.m. on October 2, 1981, Judge Stephen Schiller issued a search warrant for the first-floor and basement apartments of 1741 North Cicero Avenue. The warrant authorized the search of a man known as "Julio," described as white male, 25 to 30 years old, 5 feet 11 inches, 150 to 160 pounds a light moustache and short, black, wavy hair. The warrant also authorized a search for heroin and for proof of residence.

At approximately 9:30 p.m. on Friday, October 2, 1981, the Chicago police executed the search warrant, and in the course of the search, arrested defendant. During a hearing on defendant's motion

to quash the arrest and suppress evidence, two detectives testified that they knocked on the door to the first-floor apartment, heard noises inside, then forced the door open. Both detectives stated that as they entered, defendant was moving from the living room toward the dining room, away from the front door. Defendant was placed on the couch, and a woman and two small children were ordered to remain seated in the living room while the police conducted their search.

Defendant testified at the hearing that he lived in the basement apartment at 1741 North Cicero. He said that his name was not Julio, that he had nothing to do with the drugs seized, and that he did not pay rent, utilities, or any other bills for the first-floor apartment. Defendant stated that on October 2, 1981, he was visiting the lady who lived in the first-floor apartment, whose name he did not know. His first knowledge of the police came when they broke the door. When they entered defendant was seated on the sofa. He stood up and they sat him down. Cross-examination produced this colloquy:

"[Assistant State's Attorney]: You are five foot eleven inches tall, are you not?

[Defendant]: More or less.

Q. And you were that height and weight or about that height and weight on October 2, 1981, weren't you?

A. I do not remember.

Q. Your hair was black on that date, wasn't it?

A. My hair is brown.

Q. Very dark brown, isn't it?

A. Yes, the way it is now.

Q. And your hair was wavy on that date, wasn't it?

A. No.

Q. Was your hair as wavy then as it is today?

A. Yes.

[Defense Counsel]: Objection, Judge, the defendant's hair is straight, not wavy.

The Court: It's got a wave on the side, very noticeable wave. Turn so your lawyer can see.

[Assistant State's Attorney]: You were between 25 and 30 years of age on October 2, 1981, weren't you?

A. Yes."

The trial court denied defendant's motion to quash the arrest.

At trial, Detective John Corcoran testified that the officers executing the search warrant first knocked and announced their offices, then they heard noises and broke the door down. Corcoran saw a

woman on the couch and saw defendant moving from the couch toward the dining room, away from the front door. He later learned that the woman's name was Digna Tirado. Corcoran searched the rear bedroom, which apparently belonged to the two small children. On a shelf in the closet, he found a large brown paper bag containing 12 cylindrical objects wrapped in duct tape. Corcoran opened one cylinder, discovered brown powder, and exclaimed "Holy s---!" He heard a disturbance in the front of the apartment and went to the living room, where he saw defendant being forcibly subdued.

Officer Frank Goff testified that he and several other police officers approached 1741 North Cicero at about 9:30 p.m. on October 2, 1981. They knocked on the door to the first-floor apartment, announced themselves, heard activity inside, and forced the door open. Goff stated that defendant was moving from the living room to the dining room when they entered; the police grabbed him and placed him on the couch. Detective Ellen Hamel stood watch over defendant, a Latin woman, and two small children while Goff searched the front bedroom. He saw a variety of both men's and women's clothing throughout the bedroom, and he found defendant's driver's license in the breast pocket of a black suitcoat with white pin stripes. Goff testified that he heard officers in the kitchen yelling that they had found a big bag, and at the same time he heard Detective Hamel yell "Stop!" Goff saw defendant running toward the kitchen, and saw two officers forcibly subdue him. According to Goff, defendant was wearing pants and a T-shirt, but no shoes; when the police prepared to transport him, defendant went to the front bedroom and put on shoes and a jacket.

Detective Ellen Hamel corroborated the testimony of Corcoran and Goff concerning entry to the premises. Hamel also recalled that defendant wore pants and a T-shirt, but no shoes. She heard Detective Corcoran yell from the back bedroom, "Holy s---, look at this." Defendant broke for the rear of the apartment and was forcibly subdued. Based on her undercover experience, Hamel testified that a gram of heroin on the street contains one or two percent heroin and costs $200.

Chicago police chemist Mary Grabarcik testified that she examined the substances seized at 1741 North Cicero and determined that the 12 cylinders contained 2,295 grams of heroin. On cross-examination, she admitted that she had no precise recall of the purity of the heroin, but on redirect she recalled that it was more pure than other samples, "approximately five to ten percent, five to ten times higher."

Officer Robert Jacobsen, an intake officer assigned to the receiving room of the Department of Corrections, testified that he interviewed defendant (in English) on October 3, 1981. Defendant told Jacobsen that he lived with Digna Tirado on the first floor at 1741 North Cicero.

Clarence Rezula testified that he had delivered mail to the 1700 block of North Cicero regularly for 14 months. Rezula said that the mailboxes for the first and second floors of 1741 North Cicero were on the front porch, and the basement mailbox was near the basement door. In January of 1981, the basement mailbox was marked "Lucina/Artiga," the mailbox for the first-floor apartment was marked "Tirado/Valentin," and the second-floor mailbox belonged to someone else who had since moved. He said he always left mail for Valentin in the first-floor mailbox, and the mail was always picked up, never returned to him. In about January of 1982, Lucina and Artiga began receiving their mail in the box for the second floor. Valentin's name was taken off of the first-floor box one week prior to trial.

Alberto Lucina and Angel Artiga testified for the defense. They stated that they lived with defendant in the basement apartment at 1741 North Cicero. They said that defendant slept in the larger bedroom, Lucina slept in the smaller bedroom, and Artiga slept on the floor in the living room. Neither Lucina nor Artiga used the telephone in the basement, and they both believed that defendant received and paid the phone bill. Several months before the trial, Lucina and Artiga moved to the second-floor apartment. On the day of the search, they returned home to find the basement door broken and their things disturbed. They believed that they had been robbed, but they did not call the police. Instead, they went to the first-floor apartment, where they saw defendant and several police officers. According to Lucina and Artiga, the police took defendant to the kitchen, and when they brought him back to the living room he was bleeding and had a black eye. The two stated that defendant was wearing pants, a shirt, and shoes.

In rebuttal, the State called Merny Miller, keeper of the records for Illinois Bell. Her records indicated that the basement telephone at 1741 North Cicero was registered to Raul B. Guerrera.

During the conference on instructions, defense counsel stated that he preferred wording different from that contained in the pattern instruction concerning defendant's failure to testify. The trial judge responded that he would only consider pattern instructions. As to proof of possession, defense counsel requested the trial court to instruct the jury "that mere presence in the vicinity of the heroin or mere knowl-

edge of the physical location, however, does not constitute possession under the statute." The trial court refused this instruction as well as the pattern instruction defining "delivery."

In closing argument, the assistant State's Attorney argued that the heroin recovered in the search, when cut to normal purity and sold on the street a gram at a time, would be worth between $3 and $6 million. Defense counsel argued that defendant was a poor immigrant, frightened and unable to understand English. In rebuttal, the prosecutor stated: "Well, if he's such a poor innocent man, just look here. He has three lawyers. And lawyers don't come cheap." The prosecutor also commented that defendant was able to function well in society without an interpreter, and that the presence of a court-appointed interpreter was a waste of the taxpayers' money. In addition, the assistant State's Attorney remarked:

> "Mr. Guinan [defense counsel] also said he wants you to be in Salvatore Valentin's shoes. He would like you to imagine him in his shoes. Well, you ask yourself, if you were in his shoes, would you have done things a little differently in this trial? Use your commonsense, everyday experience."

This last comment was the subject of a motion for mistrial at the close of argument.

After deliberations, the jury returned guilty verdicts as to the charges of possession and possession with intent to deliver. The trial court found that the offenses merged, and sentenced defendant to 25 years in prison for possession with intent to deliver. Defendant filed a timely notice of appeal.

OPINION

Defendant first contends that his arrest violated his right to be free from unreasonable seizure of his person, and that evidence connected with the arrest should have been excluded. Defendant argues that the police lacked probable cause particularized to him, in that the police were looking for a white male named Julio, whereas defendant is not white, but hispanic, and his name is not Julio. The State argues that the officers had probable cause when they arrested defendant.

The proponent of a motion to suppress has the burden of establishing that his fourth amendment rights were violated by the challenged search or seizure. (*Rakas v. Illinois* (1978), 439 U.S. 128, 130-31 n.1, 58 L. Ed. 2d 387, 393 n.1, 99 S. Ct. 421, 424 n.1; *People v. Berg* (1977), 67 Ill. 2d 65, 364 N.E.2d 880.) In order to decide whether a warrantless arrest meets the probable cause requirement, the trial court must determine whether a reasonable and prudent

man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense. (*People v. Robinson* (1976), 62 Ill. 2d 273, 276, 342 N.E.2d 356.) The court should avoid an overly technical approach and instead should take a commonsense view of the totality of the circumstances. (*People v. Tisler* (1984), 103 Ill. 2d 226, 245-56, 469 N.E.2d 147.) Once the probable cause determination has been made by the trial court, a court of review will not disturb it absent manifest error. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766.) Moreover, a reviewing court may consider all facts and circumstances which pertain to the probable cause issue, and it is immaterial that such facts were disclosed at trial rather than at the suppression hearing. *People v. Caballero* (1984), 102 Ill. 2d 23, 36, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.

■ Initially, we note that the detention of defendant during the execution of the search warrant was fully consistent with the fourth amendment. The United States Supreme Court held in *Michigan v. Summers* (1981), 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587, that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (452 U.S. 692, 705, 69 L. Ed. 2d 340, 351, 101 S. Ct. 2587, 2595.) Defendant concedes that the instant search warrant was valid, and so the reasonableness of defendant's arrest depends upon what the police knew at the conclusion of the search.

■ We hold that the police had probable cause to arrest defendant for possession of a controlled substance. When they arrived at 1741 North Cicero on October 2, 1981, the police had reliable information that a man with access to the basement and first-floor apartments had sold a quantity of heroin that morning. They entered the first-floor apartment and saw defendant moving away from them. Defendant answered the description of the man who had sold the heroin, and at about 9:30 p.m. on a Friday, he was present in the first-floor apartment wearing pants and a T-shirt, but no shoes. During the search, police found a variety of men's clothing, and they found defendant's driver's license in the breast pocket of a suitcoat in the front bedroom. They discovered a large quantity of heroin in the bedroom of two small children, and in response to the detective's exclamation, defendant attempted to flee. A commonsense view of these circumstances would lead a cautious person to believe that defendant committed the offense.

Defendant's argument to the contrary approaches the absurd. He

asserts that the description of a white male named Julio cannot supply probable cause for the arrest of a hispanic male named Salvador. We believe that the difference between "white" and "hispanic," for the purposes of a description in a search warrant, is one of mere characterization. And the possibility that a drug dealer would use an alias must be obvious to all. Such matters do not even rise to the level of inconsistency. Far from carrying his burden to show that his arrest was unreasonable, defendant's evasive and palpably incredible testimony at the suppression hearing justified the trial court in rejecting his motion.

■ Defendant next contends that the State produced insufficient evidence to prove his guilt beyond a reasonable doubt. He claims that the evidence failed to show that he controlled the premises, and he argues that the doctrine of constructive possession should be reexamined in light of *People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151, *cert. denied* (1981), 454 U.S. 845, 70 L. Ed. 2d 131, 102 S. Ct. 160. The State asserts that *Housby* is inapplicable, or alternatively, that the doctrine of constructive possession satisfies the constitutional test outlined in *Housby*. The State maintains that the evidence was sufficient to support defendant's convictions.

In order to sustain a conviction for possession of a controlled substance, the State must prove that the accused knew of the presence of the substance and that the substance was in the immediate and exclusive control of the accused. (*People v. Galloway* (1963), 28 Ill. 2d 355, 358, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) Possession may be actual or constructive: constructive possession "is that which exists without actual personal present dominion over a chattel, but with an intent and capability to maintain control and dominion." (*People v. Fox* (1962), 24 Ill. 2d 581, 585, 182 N.E.2d 692.) Possession and knowledge are questions of fact to be resolved by the jury, and such findings will not be set aside on review unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of guilt. See *People v. Mack* (1957), 12 Ill. 2d 151, 145 N.E.2d 609.

The State produced sufficient evidence in this case for the jury to conclude that defendant had both knowledge and control of the heroin which was found during the search. The search uncovered a variety of men's and women's clothing in the front bedroom, and a suitcoat which contained defendant's driver's license. Defendant put on shoes and a jacket from the bedroom before he was transported to the police station. He told the intake officer there that he lived with Digna

Tirado on the first floor. The mailman testified that defendant's name appeared with Tirado's on the mailbox for the first floor, that he delivered defendant's mail to that box, and that the mail was always retained, never returned. From this evidence, the jury was entitled to infer that defendant lived with Tirado in the first-floor apartment. Further, the evidence indicated that defendant was moving away from the door when the police knocked and announced themselves, and that defendant attempted to flee when the police discovered the heroin. Defendant's name was removed from the first-floor mailbox one week before trial. From this, the jury was entitled to infer not only that defendant knew where the drugs were, but also that defendant was conscious of his guilt.

■ We find that the analysis in *People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151, *cert denied* (1981), 454 U.S. 845, 70 L. Ed. 2d 131, 102 S. Ct. 160, has no application in this case. In *Housby*, the jury was instructed that it could infer burglary from defendant's unexplained possession of recently stolen property. The *Housby* court, consistent with contemporaneous decisions of the United States Supreme Court, held that such an inference must bear a certain relation to the underlying facts in order to satisfy the due process clause. (84 Ill. 2d 415, 424.) By contrast, the jury in this case was instructed:

> "Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing but he has both the power and the intention to exercise control over a thing either directly or through another person.
>
> If two or more persons share the immediate and exclusive control or share the intention and the power to exercise control over a thing, then each person has possession."

This is the very definition of possession, and the instruction neither compels nor suggests an inference to the jury. That the jury inferred defendant's constructive possession from proof that he resided in the first-floor apartment is as inconsequential as it is unremarkable: the trial court did not instruct the jury that they should infer or presume possession from residence, and so the due process problem addressed in *Housby* simply did not arise. (*Cf. People v. Richardson* (1984), 104 Ill. 2d 8, 470 N.E.2d 297 (*Housby* not applicable to interference of intent from circumstantial evidence).) The trial court did instruct the jury that the State was required to prove each element of the crime beyond a reasonable doubt, and we are confident that the jury's verdict reflects such certainty.

■ Finally, defendant contends that cumulative error warrants a new trial. He argues that the trial court erred in rejecting nonpattern jury instructions, and that the prosecutors engaged in improper comment. Specifically with respect to jury instructions, the trial judge stated that he would "only consider" Illinois Pattern Instructions (IPI), and defendant maintains that such blanket refusal to consider nonpattern instructions constitutes error. Defendant also argues that the trial judge improperly refused the pattern instruction which defines "delivery," stating, "He's not charged with intent to deliver."

Our review of the record indicates that defendant's argument misconstrues the context of the trial judge's statements during the instruction conference. For example,

"[The court]: The fact that the defendant did not testify should not be considered. IPI 2.04.

Do you want that, Mr. Guinan?

Mr. Guinan [defense counsel]: Yes, I do, but I kind of like it in a different statement, if you will consider it.

The court: Well, I only consider IPI."

In context, this colloquy shows no more than differing preferences as to the wording, and the trial court was correct to point out that the wording of an applicable pattern instruction prevails unless some insufficiency is shown. (See 87 Ill. 2d R. 451(a).) Similarly, the trial judge's statement concerning "intent to deliver" was made in the context of the pattern instruction defining "delivery." Because the State introduced no evidence of defendant's "delivery" of a controlled substance, the trial court properly refused the instruction. With respect to defendant's modification of the proof of possession instruction, set out in the facts, we believe that the trial court properly rejected it, for the modified language is unduly argumentative. (See 87 Ill. 2d R. 451(a).) The instructions as a whole accurately conveyed the principles of law applicable to the facts, and we can discern no error.

■ Defendant posits that the prosecutors attempted to inflame the jury in closing argument. He points to the multiplication of heroin's street price per gram by the number of grams seized by the police, and draws an analogy to the practice of plaintiffs' attorneys, now condemned, asserting a *per diem* value for pain and suffering. Defendant complains that the prosecutors undercut his right to counsel by commenting on their expense, and attempted to prejudice the jury against him for his use of an interpreter. He also claims that the prosecutors alluded to his failure to testify. The State argues that the remarks were proper or harmless.

In general, matters in evidence and reasonable inferences there-

34

from are proper subjects of comment to the jury. (*People v. Warmack* (1980), 83 Ill. 2d 112, 125-26, 413 N.E.2d 1254; *People v. Hairston* (1970), 46 Ill. 2d 348, 375, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) A reviewing court should assess arguments of counsel in the context of the whole trial, and should sustain a conviction unless it appears that improper comment substantially prejudiced the accused. See *People v. Baptist* (1979), 76 Ill. 2d 19, 28-29, 389 N.E.2d 1200; *People v. Tate* (1970), 45 Ill. 2d 540, 545-46, 259 N.E.2d 791, *cert. denied* (1971), 401 U.S. 941, 28 L. Ed. 2d 222, 91 S. Ct. 944.

We note that defendant entered a contemporaneous objection as to only one of the comments of which he now complains, that is, the inquiry "would you have done things a little differently in this trial?" We note, too, that defendant did not specify any allegedly improper comments in his post-trial motion. By his failure to object and his failure to specify such comments in his post-trial motion, defendant deprived the trial court of any opportunity to strike and cure the comments or to assess their prejudice, and so we consider any error to have been waived. See *People v. Carlson* (1980), 79 Ill. 2d 564, 576-78, 404 N.E.2d 233.

■ We find no error in the prosecutor's computation of the street value of the heroin seized. These comments were based on the evidence, and were relevant to defendant's intent to distribute. Disapproval of *per diem* pain and suffering computation in civil cases is based in part upon the lack of commercial value to pain and suffering and in part upon the jury's familiarity with such matters. (See *Caley v. Manicke* (1962), 24 Ill. 2d 390, 392-93, 182 N.E.2d 206.) The same cannot be said of heroin.

■ We believe that the remaining comments fell short of reversible error. Defendant argues that the inquiry whether the jurors would do "things" differently at trial was an attempt to draw attention to defendant's failure to testify. We believe that the remark, which is set out in full in the facts, was too fleeting and too oblique to have prejudiced the jury. The comment concerning defendant's three expensive attorneys, when read in context, seems more a reply to defense counsel's emphasis upon defendant's poverty than it does an imputation of guilt from the exercise of defendant's right to counsel. We question the need for such a comment, however. The State makes no attempt to defend the prosecutor's statement that defendant's interpreter was a waste of the taxpayers' money. While we would hold these comments improper, we conclude that they could have had no impact on the jury's resolution of the issues in the case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, the State's Attorney's fee request is hereby granted, and a fee of $75 is assessed against defendant.

Affirmed.

MEJDA, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. I am of the opinion that the trial court erred in overruling the defendant's motion to quash his arrest and suppress the evidence derived therefrom.

On October 2, 1981, John E. Corcoran, a Chicago police officer, subscribed and swore to a "boiler plate" complaint for a search warrant. The typical assertions in the complaint for the search warrant to establish probable cause were statements of a "previously reliable informant" to Officer Corcoran that the informant on October 2, 1981, at about 10:30 a.m. had seen, used and purchased heroin in the first-floor and basement apartments at 1741 North Cicero Avenue from "Julio," a white male. Based on Corcoran's complaint a search warrant issued which commanded a search of "1741 N. Cicero Avenue, first-floor and basement, Chicago, Cook County, Illinois" and the white male "known as 'Julio'." The search warrant also commanded the seizure of heroin "and proof of residency" from the premises to be searched.

Officer Corcoran, accompanied by other Chicago police officers, on October 2, 1981, in execution of the search warrant, forcibly entered the described premises and in the first-floor apartment they arrested the defendant, Salvador Valentin. The officers thereafter searched the apartment and found the narcotics which the defendant was found guilty of possession.

The defendant filed a pretrial motion to quash the arrest and suppress the evidence, in which he asserted that his arrest was without probable cause or warrant and that the arrest violated his constitutional right to be secure from unreasonable search and seizure. His motion prayed that the evidence derived from his constitutionally invalid arrest be suppressed and excluded from his trial. The State filed no response to the defendant's motion.

The defendant did not contest the validity of the complaint for the search warrant or the search warrant itself. The majority concludes, mistakenly I submit, that because "[d]efendant concedes that the in-

stant search was valid *** the reasonableness of defendant's arrest depends upon what the police knew at the conclusion of the search." But it is fundamental, as well as elementary, that subsequently obtained fruits of a search cannot be relied upon to validate a prior illegal arrest. *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

Moreover, the defendant did not seek suppression of the narcotics seized from the first-floor apartment in execution of the warrant. Rather, it was the defendant's position that he was not the white male "Julio" named in the warrant, but he was a hispanic from Puerto Rico who could not speak English and whose name was Salvador Valentin, that he did not live in the first-floor apartment in which the narcotics were discovered, that there was no probable cause or warrant for his arrest and that his arrest was therefore constitutionally impermissible. He sought suppression of his statements, information and other evidence derived from, what he urged was, his illegal arrest. Valentin urged that Officer Frank Goff's purported post-arrest conduct of taking him into a bedroom for his shoes and jacket, the items Officer Goff claimed he found in the bedroom after Valentin's arrest, which included a man's jacket which Goff contended contained Valentin's driver's license, Valentin's oral statements made to the county jail admissions officer the day following his arrest, and Valentin's January 12, 1982, bail hearing testimony, were.derived from his invalid arrest and should have been suppressed as evidence at his trial.

At the motion to suppress hearing, the defense attorney clearly defined the issues as follows:

> "The defendant does not reside in those premises, and therefore, the search warrant does not apply to him. ***. [T]here is no probable cause to arrest him, certainly the search warrant doesn't give authority to the police officers to arrest the defendant."

Prior to and during the hearing of the defendant's motion, the State did not contend that the hispanic defendant, Salvador Valentin, was the white "Julio" named in the warrant. Such a biological miracle could not be even verbally accomplished by the State's legal representative.

At the hearing of the motion, the defendant called Officer John Corcoran as a defense witness. Corcoran testified on direct examination that on October 2, 1981, during the early evening hour of 8:30 or 9 p.m., he and his fellow officers executed the warrant at 1741 N. Cicero, that there were separate living quarters on the first floor and

basement, that Sergeant Weinberg knocked on the first-floor door, that they broke in the door and when they entered the first-floor apartment the defendant, Salvador Valentin, "was moving from the living room to the dining room," that "he [Valentin] was fully clothed," that the officers grabbed Valentin and sat him down on the sofa in the living room, that the officers then proceeded to search the premises and that he did not know the defendant to be and had never heard him called "Julio." Officer Corcoran further stated on direct examination that a woman "in her late twenties, early thirties" and two small children were also in the apartment.

The assistant State's Attorney did not ask Officer Corcoran a single question on cross-examination. The assistant State's Attorney stated upon conclusion of Corcoran's direct examination, "We may wish to call him as our witness."

The defendant next called Chicago police officer Ellen Hamel, who testified that she, with Officer Corcoran and other officers, forced open the first-floor apartment entrance door, observed the defendant moving from the living room into the dining room and that they "subdued and placed [him] on a sofa." She, too, testified that there was a woman and two small children in the apartment. The defense attorney then inquired of Officer Hamel if she discovered "contraband in the back bedroom, the children's bedroom of that home." The assistant State's Attorney objected. The court sustained the objection. In the ensuing colloquy, the trial court stated:

> "The only issue here is probable cause. Did the officer have the authority under what they had to act in the fashion in which they did at this time. *What subsequent information may have developed is really irrelevant on the issue of probable cause.*" (Emphasis added.)[1]

The defendant's attorney attempted to establish by examination of Officers Hamel and Corcoran that no indicia of defendant's ownership or possession of the apartment, such as receipts and utility bills, were discovered in the apartment. His efforts were successfully thwarted by the court's consistently favorable rulings on the State's objections to this line of inquiry.

Not a single question was asked of Officer Hamel by the assistant State's Attorney on cross-examination. At the conclusion of her direct-examination testimony, Hamel was directed by the assistant

---

[1]Conversely, however, in affirming the trial court's order overruling the defendant's motion to suppress, the majority states that "the reasonableness of defendant's arrest depends upon what the police knew at the conclusion of the search."

State's Attorney "to remain in the back room."

The defendant, Salvador Valentin, through an interpreter, then testified. He stated that he lived at 1741 North Cicero in the basement apartment, that on October 2, 1981, he was visiting a lady in the first-floor apartment "seated on a sofa" when the police "broke the door and came in," that he got up and the officers sat him down, after which they searched the apartment, that he had nothing to do with what the officers found in the back room and that he did not pay the telephone, gas, electric bills or rent for that apartment.

The assistant State's Attorney inquired of the defendant, and the defendant testified on cross-examination, that he had lived in the basement at 1741 North Cicero for 2½ years. The assistant State's Attorney further queried:

"Q. When the police came into your home at 1741 North Cicero, they showed you a warrant, didn't they?

A. They gave a paper to the lady that was there.

Q. And you know that that paper was a search warrant, isn't that right?

A. I found out later."

The defendant testified on further cross-examination that he was visiting in the first-floor apartment, that he did not have a key to the first-floor and that he had been in the first-floor apartment only once before. He stated that he was "more or less" 5 feet 11 inches tall, that his hair was brown, that his hair was not wavy, and that he was between 25 and 30 years of age. The defendant stated that he did not keep his clothes in the first-floor apartment, that he did not keep a sport coat in the closet in the first-floor apartment, that he kept his driver's license in his wallet, that his wallet was in his pocket when he was arrested, and that he had never been in the rear closet of that apartment. At the conclusion of this testimony, the defendant rested on the motion.

As previously stated, the officers who executed the search warrant and arrested the defendant and who were called as defense witnesses at the suppression hearing, were not asked a single question on cross-examination by the assistant State's Attorney. Although they were available, not a single officer was called by the assistant State's Attorney at the hearing to explain or establish probable cause for the defendant's arrest. In arguing that the defendant's motion should be denied, the assistant State's Attorney stated to the court:

"They [the police officers] executed a warrant, they found him there meeting the description of the person supposed to be in the warrant and they placed him under arrest."

There simply is not one shred of evidence in this entire record that the officers arrested this hispanic defendant, whose name is Salvador Valentin, because he fit the description of the white male "Julio" named in the warrant. The assistant State's Attorney who made this argument was the same assistant State's Attorney who declined to cross-examine the arresting officers or call them as State witnesses. His blatant refusal to have even attempted to have the officers testimonially establish their basis for their arrest of the defendant, or to establish that the defendant fit the description of the person named in the warrant, inferentially establishes that they did not arrest the defendant for that reason. Moreover, if the defendant was arrested because he fit the description of "Julio," the officers would have so testified and would have served him with a copy of the warrant, rather than serve the adult female, who admittedly resided in the apartment with her two children. The evidence, without contradiction, established that they did serve her with a copy of the warrant pursuant to section 108—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 108—6). This section provides:

"If the warrant is executed the duplicate copy shall be left with any person from whom any instruments, articles or things are seized or if no person is available the copy shall be left at the place from which the instruments, articles or things were seized."

The trial judge could not and did not accept the unsupported assertion by the assistant State's Attorney that the defendant fit the description in the warrant. Instead, the trial court found:

"*** that the officers entered the premises pursuant to a warrant and made the search and arrest of the defendant with probable cause. *** *The court feels that the seizure of the only male occupant in the premises at the time was consistent with the warrant* and there was no impropriety on the part of the police officers, and your motion to quash the arrest and suppress the evidence is denied." (Emphasis added.)

The State's brief before this court adheres to the untenable position the State took in the trial court, *i.e.*, that the hispanic Salvador Valentin fit the description of the white male "Julio" named in the warrant. The State's brief tacitly acknowledges, however, that the grounds relied on by the trial judge in denying the motion, *i.e.*, that the officers arrested the defendant with probable cause, is untenable. This double-barrel shotgun argument must be rejected. The complaint and search warrant established probable cause to arrest "Julio." In fact, the warrant commanded "Julio's" arrest. But the probable cause

and arrest command for "Julio" did not transfer to the defendant Valentin simply because Valentin was "the only male occupant on the premises at the time." It is the epitome of exaggerating and convoluting facts to find that the officers arrested this hispanic defendant, Salvador Valentin, because he fit the description of the white male "Julio" named in the warrant. Moreover, the majority's statement that "We believe that the difference between 'white' and 'hispanic,' for the purposes of a description in a search warrant, is one of mere characterization," is unclear. At the very least the statement is repugnant to the fourth amendment to the Constitution of the United States, which is applicable to and binding upon the States through the fourteenth amendment. The *fourth amendment* provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but *upon probable cause,* supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons* or things *to be seized.*" (Emphasis added.) (U.S. Const., amend IV.) Similar language appears in the Illinois State Constitution. Ill. Const. 1970, art. II, sec. 6.

In *United States v. Di Re* (1948), 332 U.S. 581, 92 L. Ed. 210, 68 S. Ct. 222, Reed, an informer, told law enforcement officers that he was to buy counterfeit gasoline ration coupons from a person named Buttitta at a specified location in Buffalo, New York. The officers trailed Buttitta's car to the designated place, where they found Reed on the rear seat holding counterfeit gasoline ration coupons in his hand. In response to the officers' inquiry, Reed responded that he obtained the coupons from Buttitta, who was sitting in the driver's seat next to the defendant Di Re. All three were taken into custody and from Di Re's person there was seized a substantial number of counterfeit coupons, which he was charged with unlawfully possessing. Di Re was convicted, over his timely objection to the constitutional invalidity of his arrest and his motion to suppress the coupons as evidence. Before the Supreme Court of the United States, the grounds relied on by the government to defend the officers' conduct were that Di Re's search was incident to a lawful arrest and incident to a search of the automobile which the officers reasonably believed was carrying contraband. The distinction between the warrantless arrest of Di Re in an automobile and the warrantless arrest of Valentin in a residence for which a valid search warrant had issued is purely a cosmetic differentiation of no substance. The government conceded in *Di Re* that such distinction was without merit, as the court pointed out. The court stated:

"The Government says it would not contend that, armed with a search warrant for a residence only, it could search all persons found in it. But an occupant of a house could be used to conceal this contraband on his person quite as readily as can an occupant of a car. Necessity, an argument advanced in support of this search, would seem as strong a reason for searching guests of a house for which a search warrant had issued as for search of guests in a car for which none had been issued. By a parity of reasoning with that on which the Government disclaims the right to search occupants of a house, we suppose the Government would not contend that if it had a valid search warrant for the car only it could search the occupants as an incident to its execution. How then could we say that the right to search a car without a warrant confers greater latitude to search occupants than a search by warrant would permit?

\*\*\*. We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." *United States v. Di Re* (1948), 332 U.S. 581, 587, 92 L. Ed. 210, 216, 68 S. Ct. 222, 228.

In holding that Di Re's conviction, based on the evidence seized from him as above set forth, could not stand, the Supreme Court rejected the government's argument that "common sense demands that such right [to arrest and search an automobile passenger] exists in a case such as this where the contraband sought is a small article which could be easily concealed on the person." In summarily repudiating this contention, the court stated:

"We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand." *United States v. Di Re* (1948), 332 U.S. 581, 595, 92 L. Ed. 210, 220-21, 68 S. Ct. 222, 232.

Over 30 years after *Di Re*, the Supreme Court in *Ybarra v. Illinois* (1979), 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338, reaffirmed the *Di Re* holding. The facts in *Ybarra* are strikingly similar to those

of the instant case. In fact, the assertions in the complaint for the search warrant and the commands of the search warrant in *Ybarra* are practically identical to those in the case at bar. In *Ybarra*, the assertions in the complaint for the search warrant to establish probable cause were statements to the affiant-officer from a reliable informant that he had repeatedly seen numerous tinfoil packets on the person of the bartender "Greg" and in a drawer behind the bar, that as a user of heroin, the informant knew that tinfoil packets were a common method of packaging heroin and that "Greg" told the informant in the tavern that he would have heroin for sale in the tavern on March 1, 1976. On that date, based on the complaint for the search warrant, a judge issued a warrant which commanded the search of the Aurora Tap Tavern and "the person of 'Greg,' the bartender, a male white with blondish hair approximately 25 years," for heroin, contraband, money, instrumentalities and narcotics paraphernalia. The court pointed out that the warrant "did not itself authorize the search of Ybarra or of any other patron found on the premises of the Aurora Tap Tavern. \*\*\*. Had the issuing judge intended that the warrant would or could authorize a search of every person found within the tavern, he would hardly have specifically authorized the search of 'Greg' alone." (444 U.S. 85, 90 n.2, 62 L. Ed. 2d 238, 245 n.2, 100 S. Ct. 338, 342 n.2.) The court pointed out further that Ybarra conceded that the warrant was valid and was supported by probable cause insofar as it authorized a search of the premises of the Aurora Tap Tavern and the person of "Greg," the bartender. In the case at bar, the defendant, Valentin, identically concedes that the warrant validly authorized the search of the first-floor and basement apartments at 1741 North Cicero and the person of "Julio." The fact that the warrant authorized a search of a tavern in *Ybarra*, rather than the search of a residence, as in the case at bar, is a superficial distinction without materiality.

Armed with the search warrant, the officers in *Ybarra* entered the Aurora Tap Tavern, announced their purpose and informed the approximately nine to 13 customers in the tavern that they were going to conduct a "cursory search for weapons." Ybarra, a patron, was in front of the bar by a pinball machine. He was patted down, at which time the officer felt "a cigarette pack with objects in it." The officer did not then remove the pack but proceeded to pat down other patrons, after which he returned and removed the pack from Ybarra. The pack contained tinfoil packets of heroin for which Ybarra was indicted. His pretrial motion to suppress the drugs was overruled on the ground that Ybarra's search was conducted under section 108—9

of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 108—9). This statute authorized an officer executing a search warrant to detain and search any person in the premises to protect himself from attack or to prevent the disposal or concealment of the article described in the warrant to be seized. Ybarra was convicted. The Illinois Appellate Court for the Second District affirmed the conviction in *People v. Ybarra* (1978), 58 Ill. App. 3d 57, 373 N.E.2d 1013. Citing *People v. Dukes* (1977), 48 Ill. App. 3d 237, 363 N.E.2d 62, the *Ybarra* court stated that the statute authorized the search of persons found in the premises described in a warrant when there was " 'some showing of a connection with those premises, *** the police officer reasonably suspected an attack, or that the person searched would destroy or conceal items described in the warrant.' " 58 Ill. App. 3d 57, 61.

The Illinois Supreme Court denied Ybarra leave to appeal. On *certiorari*, the Supreme Court of the United States stated that the question before it was "whether the application of this statute to the facts of the present case violated the Fourth and Fourteenth Amendments." (*Ybarra v. Illinois* (1979), 444 U.S. 85, 87, 62 L. Ed. 2d 238, 243, 100 S. Ct. 338, 340.) The Supreme Court stated that the Illinois statute purported "to authorize the police in some circumstances to make searches and seizures without probable cause and without search warrants. This state law, therefore, falls within the category of statutes purporting to authorize searches without probable cause, which the Court has not hesitated to hold invalid as authority for unconstitutional searches." (444 U.S. 85, 96 n.11, 62 L. Ed. 2d 238, 248-49 n.11, 100 S. Ct. 338, 345 n.11.) Understandably, the State in the instant case does not urge that this statute validates defendants Valentin's arrest.

The court pointed out in *Ybarra* that the officers had no probable cause to believe that any person found in the tavern, except "the bartender 'Greg,' " would be violating the law and that "a warrant to search a place cannot normally be construed to authorize a search of each individual in that place."

The following language of the United States Supreme Court in reversing Ybarra's conviction is most applicable to the case at bar:

> "Not only was probable cause to search Ybarra absent at the time the warrant was issued, it was still absent when the police executed the warrant. *** In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have her-

oin for sale.

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York* 392 U.S. 40, 62-63. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. ***

Each patron who walked into the Aurora Tap Tavern on March 1, 1976, was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from the Fourth and Fourteenth Amendment protection possessed by the proprietor of the tavern or by 'Greg.' Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search 'Greg,' it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers." *Ybarra v. Illinois* (1979), 444 U.S. 85, 90-92, 62 L. Ed. 2d 238, 245-46, 100 S. Ct. 338, 342.

Ybarra was a guest in a public tavern when he was arrested prior to the officers' search of the premises. Defendant Valentin contends that he was a guest in the premises (apartment) when he was arrested prior to the officers' search of the premises. He was not the male white "Julio" named in the search warrant, and in the trial court the State did not rely on his possession or occupancy of the premises as a basis for his arrest. Nor does the State so contend before this court. In fact, the record before us reveals that the officers did not know and had never heard of Valentin when they entered the apartment and arrested him.

In *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, Creach and Ruppert were arrested as they approached the residence of Creach's mother. The supreme court held that the pretrial suppression motion of Creach was properly overruled by the trial court because evidence was presented at the motion hearing that the officers had probable cause to arrest him. The court affirmed Creach's murder and armed robbery convictions. In reversing the conviction of Ruppert,

however, the court held that the trial judge erred in denying his suppression motion because there was no probable cause for his arrest. The court stated:

"This evidence was manifestly insufficient to establish probable cause for the arrest of Ruppert. We note that, with respect to searches, *'probable cause particularized with respect to [the] person *** cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.' (Ybarra v. Illinois* (1979), 444 U.S. 85, 91, 62 L. Ed. 2d 238, 245, 100 S. Ct. 338, 342.) *Similarly, probable cause to arrest a particular individual does not arise merely from the existence of probable cause to arrest another person in the company of that individual."* (Emphasis added.) 79 Ill. 2d 96, 102-03.

Based on the foregoing, it is my opinion that the trial court erred when it overruled the defendant's motion to quash his arrest and suppress evidence and when it admitted into evidence (1) Officer Goff's testimony that he accompanied Valentin into a bedroom for Valentin's jacket and shoes as they were taking Valentin from the apartment; (2) the items Goff claimed he found in the front bedroom, including a man's jacket which purportedly contained Valentin's driver's license; and (3) Valentin's statements to the jail intake official in response to his question when Valentin was admitted to the county jail on October 3, 1981, the day after his arrest.

The majority states that "a reviewing court may consider all the facts and circumstances which pertain to the probable cause issue, and it is immaterial that such facts were disclosed at trial rather than at the suppression hearing. *People v. Caballero* (1984), 102 Ill. 2d 23, 36, 464 N.E.2d 223." But no additional probable-cause facts were disclosed at trial in the case at bar, and the majority opinion does not point out any such additional probable-cause facts.

Valentin's movement away from the door as the officers forcibly entered (which movement Valentin denied) is just as suggestive of innocence as it is of guilt. It would appear to be naturally instinctive to move away from a door being forcibly entered. Valentin was immediately arrested and ordered to sit on the living room couch. Valentin's subsequent efforts to flee when the officers proclaimed that they had discovered the drugs cannot relate back to or be relied on as probable cause for Valentin's arrest which had occurred previously. The same is true regarding Valentin's purported post-arrest acquisition of his coat from a bedroom in the apartment. Valentin likewise denied that his

coat was in the bedroom.

Additionally, the postman's trial testimony of the names on and location of the mailboxes at the premises and the jail intake officer's trial testimony of his conversation with Valentin was post-arrest information and was not and could not have been relied on by the officers as probable cause for their arrest of Valentin.

Valentin contends that by reason of his illegal arrest he was charged with the unlawful possession of the drugs seized in the first-floor apartment. He further asserts that he, who had never been arrested, was held in custody because of his inability to make the constitutionally prohibitive $500,000 bond. Pursuant to his rights under the eighth amendment to the Constitution of the United States and article 1, section 9, of the Illinois Constitution to reasonable bail, he presented a bail reduction motion and testified at the hearing thereof. During the State's case in chief at trial, the court admitted as substantive evidence Valentin's bail hearing testimony that he lived at 1741 North Cicero and that he "worked in music."

A defendant has a constitutional right to reasonable bail. (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, sec. 9.) Intrinsic therein is the defendant's right to a hearing and his right to testify at such hearing to reduce a constitutionally prohibitive, excessive bail. A criminally accused defendant is also cloaked with the constitutional privilege against self-incrimination and the right not to testify at trial. This presents the inherent issue of whether a defendant who testifies at his bail-reduction hearing thereby waives his constitutional privilege against self-incrimination and his right not to testify at his trial when the State uses the defendant's bail-hearing testimony as substantive evidence against the defendant during the State's case in chief. Although this issue was not argued before this court in the instant case, it is to be noted that in *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2 1247, 88 S. Ct. 967, the United States Supreme Court reversed the defendant, Garrett's, armed robbery conviction because the government was allowed to use Garrett's motion to suppress testimony as substantive evidence against him in its case in chief. The court stated:

> "Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, *we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a*

*motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.*" (Emphasis added.) 390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259, 88 S. Ct. 967, 976.

In *People v. Luna* (1967), 37 Ill. 2d 299, N.E.2d 586, the defendant was charged with the unlawful sale of narcotics. He confessed. The defendant's testimony at the hearing on his motion to suppress his confession was, in part, substantially the same as his confession. The confession was suppressed. At trial, the State was allowed to use the defendant's testimony from the suppression hearing to impeach the defendant's trial testimony. The supreme court held that for the State to have done so was reversible error. The supreme court overruled *Luna* in *People v. Sturgis* (1974), 58 Ill. 2d 211, 317 N.E.2d 545, but in so doing further held:

"We therefore hold that the testimony of a defendant or documents voluntarily attested to by him in conjunction with his motion to suppress evidence may not be introduced by the State directly in its case in chief." 58 Ill. 2d 202, 216.

In *People v. Smith* (1978), 67 Ill. App. 3d 952, 957-58, 385 N.E.2d 707, the court stated:

"*A defendant is not required to surrender his Fifth Amendment protection against compelled self-incrimination in order to assert his Fourth Amendment rights. (Simmons v. United States* (1968), 390 U.S. 77, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) In light of the usual necessity of defendants to take the witness stand at a suppression hearing and of their burden of proof when challenging the lawfulness of a search and seizure, the law has been fashioned toward a policy of permitting defendants to testify at a suppression hearing without requiring a waiver of the privilege against self-incrimination. [Citation.] To this end, the United States Supreme Court had held that when a defendant testifies in support of a motion to suppress evidence illegally seized, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." (Emphasis added.)

The United States Supreme Court stated in *Brown v. United States* (1973), 411 U.S. 223, 228, 36 L. Ed. 2d 208, 213, 93 S. Ct. 1565, 1568-69:

"Subsequent to *Jones*, in *Simmons v. United States* *** we held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to

establish standing to move to suppress evidence. \*\*\* [W]hether he succeeds or fails to suppress the evidence, his testimony on that score is not directly admissible against him in the trial."

My research fails to reveal a case in which the court admitted a defendant's pretrial bail-reduction testimony, presented in exercise of his Federal or State constitutional right to reasonable bail, as substantive evidence against the defendant during the State's case in chief at trial.

The defendant urges that his bail-hearing testimony was fruit of the poisonous tree, *i.e.*, his illegal arrest, and that it was therefore inadmissible under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. CT. 2248, and *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664. Defendant further contends that the admission of his bail-hearing testimony during the State's case in chief as substantive evidence of his guilt was reversible error.

In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the defendant was arrested without probable cause or warrant. After receiving the Miranda warnings, the defendant made two in-custody inculpatory statements, which the trial court refused to suppress as evidence. The statements were admitted against the defendant, and the jury convicted him of murder. The Illinois Supreme Court acknowledged that Brown's arrest was unlawful but held that his statements were admissible because the Miranda warnings to the defendant broke the causal continuity between the invalid arrest and the defendant's statements, which were "an act of free will to purge the primary taint of the unlawful invasion." The Supreme Court of the United States held that the Illinois Supreme Court erred in holding that the Miranda warnings severed the juxtaposition between the defendant's illegal arrest and his inculpatory statements, and in holding that the statements, so long as they were voluntary and not coerced, were admissible under the fifth and fourteenth amendments to the United States Constitution. The Supreme Court further held that the State did not sustain its burden of showing that Brown's in-custody statements had been purged of the taint of his illegal arrest under the fourth amendment to the United States Constitution.

In *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the defendant was arrested without probable cause. He was advised of his Miranda rights and waived counsel. Pursuant to his in-custody interrogation, he made statements and drew sketches

which incriminated him in an attempted robbery and homicide. His pretrial suppression motion was overruled, and he was convicted. The United States Supreme Court reversed, holding that under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the fourth amendment's analytical focus was on the causal connection between the defendant's illegal arrest and the defendant's statement, and that temporal proximity of the arrest and the statement, the presence of intervening circumstances and the purpose and flagrancy of the police misconduct are factors to be considered in determining whether the defendant's statement was obtained by an exploitation of the defendant's constitutionally invalid arrest. The court found that no intervening circumstances occurred which broke the connection between Dunaway's illegal arrest and his confession.

In *Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664, the defendant confessed to a robbery after being arrested without a warrant or probable cause. He had been given his Miranda warnings and had been allowed a visit with his girlfriend. Relying on *Brown v. Illinois* and *Dunaway v. New York*, the Supreme Court held that the defendant's confession should have been suppressed as the fruit of an illegal arrest and that there was not sufficient attenuating intervention to break the causal intermediary of the initial infectious arrest and to purify the confession.

In *People v. Johnson* (1983), 94 Ill. 2d 148, 445 N.E.2 777, an informer accompanied the officers and identified the apartment in which the murder suspects lived. The informer had shortly before given the officers a detailed description of one of the two suspects. The officers saw the defendant, who matched the detailed description of the suspect, when a lady opened the apartment door pursuant to the officers' knock and command. The defendant was arrested. The .38-caliber murder weapon was found in the defendant's apartment. He sought to have it and his inculpatory statements suppressed. Citing *Taylor, Dunaway* and *Brown* as authority, the Illinois Supreme Court held, "Defendant was arrested, taken to the police station, and questioned intermittently until he made the oral inculpatory statements. No intervening circumstances between the arrest and the statements were shown which would serve to dissipate the taint of the illegal arrest; his inculpatory oral statements should have been suppressed." 94 Ill. 2d 148, 160.

Based on the foregoing authority, I submit that the trial court erred in admitting Valentin's bail-hearing testimony as evidence against him during the State's case in chief.

Before Valentin was called as a witness at his bail-reduction hear-

ing, the trial judge stated, "The court personnel will assist us, act as interpreter, if necessary." The record reveals that the sheriff acted as an interpreter. The record at that point does not reveal the identity of the sheriff, whether the sheriff was an official interpreter of the circuit court of Cook County, whether he could speak Spanish, or whether the sheriff was administered an interpreter's oath. The defendant testified at the bail reduction hearing through this unsworn court attache. These factors alone rendered the defendant's bail-hearing testimony inadmissible as substantive evidence at trial. (See Ill. Rev. Stat. 1981, ch. 38, pars. 165—11 and 165—12, which provide, "If the court finds the accused incapable of so understanding or so expressing himself, the court shall appoint an interpreter for the accused whom he can understand and who can understand him. ***. The court shall enter an order of its appointment of the interpreter who shall be sworn to truly interpret or translate all questions propounded or answers given as directed by the court.")

The defendant further contends for reversal that the evidence failed to establish beyond a reasonable doubt that he unlawfully possessed the narcotics seized from the children's back bedroom closet in the first-floor apartment at 1741 North Cicero Avenue. The State's evidence was that the defendant was in the first-floor apartment when the drugs were seized; that the defendant's driver's license, his applications for a city and State automobile license and his automobile title listed his address as 1741 North Cicero, and that men's clothing were found in a footlocker and in a closet in the apartment. The State's evidence also included the testimony of the county jail intake officer, who stated the defendant told him he lived on the first floor, and the postman's testimony that the defendant received mail in the first-floor mailbox, to which the defendant's name was affixed.

The State further relied on Officer Goff's testimony to establish the defendant's possession of the apartment and, thus, the drugs. Goff testified that when he entered the apartment the defendant was wearing only a T-shirt and pants but no shoes, that the defendant had to be subdued when the officers pronounced the discovery of the drugs, and that the defendant obtained a leather jacket and shoes from a back room of the apartment preparatory to his departure.

Conversely, the defendant vociferously argues that he lived in the basement apartment at 1741 North Cicero and that his driver's license, his city and State automobile license, automobile title and applications, which state his address as 1741 North Cicero, are not evidence that he lived on the first floor or that he did not live in the basement. The defendant further contends that no indicia of his occu-

pancy or possession of the first-floor apartment, such as keys, lease, receipts, utility bills or his clothing in the apartment, were presented. Also, defendant contends, no fingerprint evidence from the narcotics packages or from the area in which the packages were recovered was offered into evidence.

Alberto Lucena and Angel Artiga were defense witnesses who testified that they lived with the defendant in the basement apartment. Both witnesses came to the first-floor apartment during the execution of the search warrant. They observed the defendant, were questioned by the officers and departed. These two witnesses testified further that the defendant was fully clothed when they saw him in the apartment. Officer Corcoran, a State witness, likewise testified that the defendant was fully clothed while in the apartment.

Officer Goff testified that the defendant had to be subdued when the narcotics were discovered. The evidence undisputedly established that the defendant was severely beaten before the officers took him from the apartment. The identity of the brutality offender or offenders was not established. Based on the testimony of Lucena and Artiga and that of Officer Corcoran, who stated that the defendant was fully clothed, along with Goff's testimony that the defendant was subdued, and the evidence that the defendant was brutally beaten, the defendant concludes that considerable suspicion is cast upon the testimony of Officer Goff that the defendant was taken into a front bedroom for his shoes and jacket. The defendant suggests the testimony of Officer Goff "blinks at reality" and "simply smacks of fabrication."

It was uncontroverted that Digna Tirada lived in the first-floor apartment with her two minor children. The apartment utility bills were in her name. She and her children were in the apartment when the officers entered. The officers served her with a copy of the warrant, in accordance with the requirements of section 108—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 108—6), which provides, "If the warrant is executed the duplicate copy shall be left with any person from whom any instruments, articles or things are seized ***." The drugs were discovered in her children's bedroom closet. From this it would appear that the evidence that Tirada possessed the drugs was more persuasive than was the evidence that Valentin possessed them.

A .38-caliber revolver and $1,155, which Valentin at the hearing of his motion to suppress denied belonged to him, were admitted into evidence against him at trial. The State made no effort to establish a nexus between the defendant and this evidence or between the weapon and money with the offense of unlawful possession of narcot-

ics, for which the defendant was charged. In the absence of such a nexus, the probative value and the materiality of the gun and money appear to be dubious. Their inflammatory and prejudicial impact is quite apparent.

Whether the foregoing evidence established beyond a reasonable doubt the defendant's possession of the drugs was a question of fact for the jury's determination. The adversarial proceedings should not have been tarnished by improperly admitted, inflammatory and prejudicial evidence (a weapon and money) and the improper, prejudicial and inflammatory arguments of an over-zealous prosecutor.

The prosecutor argued to the jury the quantity of the drugs, its "enormous value to the people who possess it," that the drugs could be diluted to "30,000 gram dosages," that "six million dollars of poison that is right here *** was recovered in the defendant's apartment," that *every person on this jury supports the efforts by law enforcement to work up that pyramid and try to cut the chain of the distribution of heroin,"* that harm occurs "when the stuff hits the street," and *"that is why it is so important for this jury to convict the defendant."* (Emphasis added.) Finally, the prosecutor argued to the jury:

> "Ladies and gentlemen, Mr. Guinan [defendant's attorney] wants you to believe that Salvator Valentin is an [*sic*] innocent man who just came to this country, earning a living, victim of circumstances. That's what he wants you to believe. *Well, if he's such a poor innocent man, just look here. He has three lawyers. And lawyers don't come cheap."* (Emphasis added.)

The sixth amendment to the Constitution of the United States provides, "In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defense." (U.S. Const., amend. VI.) The due process clause of the fourteenth amendment makes this right to counsel binding on the States. (*Gideon v. Wainwright* (1963), 372 U.S. 335, 342, 9 L. Ed. 2d 799, 804, 83 S. Ct. 792, 795.) Article 1, section 8 of the Illinois Constitution provides, "In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel ***." (Ill. Const. 1970, art. I, sec. 8.) Inasmuch as the right to counsel is conferred by the State and Federal constitutions, it is axiomatic that a prosecutor's comments about the number of lawyers representing the defendant, which comments were made in an effort to persuade the jury to convict, is impermissible. It is likewise impermissible to comment on the defense attorney's fee to the defendant, *e.g.*, "And lawyers don't come cheap." This iniquitous argument that the defendant was not an "innocent man" be-

cause "he has three lawyers" was unpardonable. Such an argument was resoundingly condemned by this court in *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306, where a prosecutor's comment on the defendant's right to counsel was found to be plain error. This court held:

> "Defendant argues that when the prosecutor commented upon defendant's telephone call to his attorney the morning after the shooting incident, the prosecutor intended to raise in the minds of the jury an inference of defendant's guilt from this conduct. The crux of the claimed constitutional error is that the prosecutor's comment and its resulting inference equate the exercise of a constitutional privilege with an admission of guilt, thereby penalizing defendant for the exercise of his right to counsel. We agree." 84 Ill. App. 3d 1065, 1071-72, 405 N.E.2d 1306.

In *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926, this court reversed the defendant's murder, attempted murder conviction and sentences because of the prosecutor's inflammatory argument to the jury that the defense attorney's trial efforts on behalf of his client were "attorney tricks" and "sleight of hand."

In *People v. Brown* (1983), 113 Ill. App. 3d 625, 629, 447 N.E.2d 1011, this court reversed the defendant's murder conviction because of impermissible argument by the prosecutor, and stated:

> "In the realm of closing arguments, there has developed a growing concern over improper prosecutorial arguments that exceed the boundaries of fairness and impartiality inherent in our system of adversary justice."

Additionally, the record in the case at bar discloses that an interpreter was assigned to translate and interpret for the Spanish-speaking defendant, Valentin, during the trial to enable him to understand the testimony and the proceedings and to cooperate with his counsel. In closing argument the prosecutor stated to the jury:

> "Mr. Valentin is able to function in our society rather well. He has two cars, a driver's license, [and is] able to do that without an interpreter. He's able to talk to the jail guard without an interpreter, court appointed interpreter. This woman is paid by the County. If you want to know where the taxpayers' money is going, how it is being wasted, these are prime examples ladies and gentlemen."

Every defendant is constitutionally entitled to a fair and impartial trial. Such a trial was denied the defendant in this case. The integrity of the fact-finding process was therefore flagrantly violated.

I am also of the opinion that the trial judge erred in refusing the defendant's instructions on delivery of a controlled substance. The defendant was tried on a two-count indictment. The second count charged that the defendant, on October 2, 1981, "committed the offense of possession of controlled substance *with intent to deliver* in that he knowingly and unlawfully possessed *with intent to deliver*, *** more than fifteen grams of *** heroin, in violation of chapter 56½, section 1401 (a—1) of Illinois Revised Statutes. ***." (Emphasis added.) This statute provides, in pertinent part, "*** it is unlawful for any person knowingly to *** possess with intent to *** deliver *** a controlled substance. Any person who violates this section with respect to: (a) the following controlled substance and amounts *** is guilty of a Class X felony. ***. (1) 15 grams or more of any substance containing heroin ***." Ill. Rev. Stat. 1981 ch. 56½, par. 1401(a)(1).

The trial judge expressly stated that he refused the defendant's instruction on delivery because "[h]e's [defendant] not charged with intent to deliver. So I would refuse that." The trial judge was in error. In fact, the trial court tendered to the jury guilty and not guilty verdict forms on "the offense of possession of a controlled substance *with the intent to deliver*," and one of the verdicts returned by the jury on the verdict form was "We, the jury, find the defendant, Salvador Valentin, guilty of the offense of possession of a controlled substance *with the intent to deliver*." (Emphasis added.) It was on this guilty finding that the court sentenced the defendant to 25 years' imprisonment, from which the instant appeal is taken.

The majority reasons that "[b]ecause the State introduced no evidence of defendant's 'delivery' of a controlled substance, the trial court properly refused the [defendant's] instruction [on delivery]." But it was not for this reason that the trial judge refused the defendant's delivery instruction. Rather, he refused the instruction for the erroneous reason that the defendant was not charged with intent to deliver.

As stated the defendant *was* charged with possession with intent to deliver. Illinois Pattern Jury Instruction (IPI), Criminal, No. 17.10 (2d ed. 1981) provides, "A person commits the offense of possession with intent to deliver a controlled substance when he knowingly possesses with the intent to deliver a controlled substance." The Committee Note to this instruction states, "Other definitions may be appropriate. See Instruction 17.01, defining delivery ***." The delivery instruction, IPI Criminal 2d No. 17.01 states, "(1) The word 'deliver' means to transfer possession or to attempt to transfer possession. (2) The word 'deliver' includes a constructive transfer of possession

which occurs without an actual physical transfer. When the conduct or declarations of the person who has the right to exercise control over a thing is such as to effectively relinquish the right of control to another person, so that the other person is then in possession, there has been a delivery."

The defendant was charged with possession with intent to deliver. The jury was not instructed on the offense that the defendant was charged with committing, and on which the jury found the defendant guilty. This was error.

Because of the foregoing, I am of the opinion that the defendant's conviction should be reversed and the cause should be remanded for a new trial.